IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NORBERT CHUNG, <br><br> *Plaintiff*, <br><br> v. <br><br> ARTHUR J. GALLAGHER & CO., a Delaware corporation, <br><br> *Defendant.* | Case No.: |

## COMPLAINT

Plaintiff Norbert Chung, by and through his attorneys, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief.

### NATURE OF THE ACTION

1. Norbert Chung is a former long-time and high-ranking employee of Defendant Arthur J. Gallagher & Co. ("Gallagher" or "Defendant") and a former Participant in the Arthur J. Gallagher & Co. Deferred Equity Participation Plan (the "Plan").

2. Mr. Chung's employment from Gallagher was suddenly and unexpectedly terminated on January 17, 2020, at the age of fifty-six, for the purpose of interfering with the attainment of rights to which Mr. Chung would have become entitled to under the Plan but for his termination in violation of section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. In particular, Plaintiff's termination was made for the purpose of interfering with the vesting of a substantial amount of future benefits under the Plan.

3. In layman's terms, Mr. Chung was terminated so that Defendant would not have to pay him the millions of dollars he was entitled to as he approached the end of a long, very successful, and incredibly loyal career with Gallagher. Up and until his firing, Mr. Chung had been a top employee with a stellar performance record, drastically increasing revenue in his

department year after year.

4. As such, it came as an unwelcome surprise to be summarily terminated without cause by William Ziebell, the Chief Executive Officer of the Benefits and Human Resources Consulting Division at Gallagher and the person to whom Mr. Chung reported. This was done only a few years away from obtaining funds set aside as part of Mr. Chung's deferred compensation plan. Had he maintained his employment with Gallagher for just a few more years, he would have reaped the rewards of his long and dedicated service to the company in the form of millions of dollars. But, in an effort to pad its bottom line, Defendant saw an opportunity to recoup those funds by prematurely terminating Mr. Chung.

5. Mr. Chung now brings this action against Defendant for interference with his attainment of rights granted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

6. Mr. Chung brings this action against Gallagher seeking (1) remedies under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Defendant's actions in interfering with Plaintiff's protected rights in violation of ERISA § 510, 29 U.S.C. § 1140, and (2) costs and attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## PARTIES

7. Plaintiff Norbert Chung is a natural person and resident of the State of California. He was hired by Gallagher in 1995 and, based on his outstanding performance, was promoted to President, Western Region in 2003. By way of his elevated position within the company, Plaintiff participated in the Plan. He was a participant in the Plan within the meaning of ERISA § 3, 29 U.S.C. § 1002(7) because he was eligible to receive benefits under the Plan and may have become eligible for additional benefits under the Plan as described below.

8. Defendant Arthur J. Gallagher & Co. is a Delaware corporation with its headquarters in Rolling Meadows, Illinois. Gallagher provides insurance brokerage, consulting, and third-party property and casualty claims settlement and administration services to businesses

and organizations around the world. As of December 31, 2019, Gallagher had approximately 33,300 employees. Gallagher professes to adhere to "The Gallagher Way," which consists of twenty-five "shared values" of the corporation. Among these, Gallagher claims to "adhere to the highest standards of moral and ethical behavior." Gallagher also alleges that it abides by the tenet that: "We support one another. We believe in one another. We acknowledge and respect the ability of one another."

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(3) and 1140.

10. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject plan was administered and where at least one Defendant may be found.

## FACTUAL ALLEGATIONS

**A.    Plaintiff's Employment with Gallagher**

11. Plaintiff began working for Gallagher in 1995 in its Los Angeles Branch after being recruited by Jim McFarlane. Plaintiff initially worked as a Vice President, managing Gallagher's Los Angeles Employee Benefits Team. At the time of his termination in 2020, the division in which Plaintiff worked was known as Gallagher Benefit Services ("GBS").

12. Plaintiff's responsibilities in that role included developing new business, managing existing client relationships, and recruiting and hiring new team members. Ultimately, Plaintiff was responsible for the overall performance of the team.

13. Plaintiff's annual starting salary was $80,000. He also earned 25% commission on new business generated.

14. Plaintiff generated $1,000,000 in new business in his first year with Gallagher and $1,200,000 in his second year. Plaintiff's new business continued to grow year after year. He also

grew the team to encompass the Orange County benefits practice.

15.     In 2003, based on his successful management and expansion of the Southern California employee benefits team, Gallagher promoted Plaintiff to Executive Vice President and Western Region Leader. Plaintiff's promotion also consisted of being named an officer of the corporation.

16.     In this role, Plaintiff's responsibilities grew substantially. He was responsible for the business operation of the Western Region—which encompassed eleven states—and all branches within it. This included maximizing operating performance and achieving its financial goals by focusing on mergers and acquisitions, managing strategic planning, driving new revenue, building team-based working environments, and generating operational efficiencies. Plaintiff was also a member of both Gallagher's Executive Committee and Divisional Strategic Planning Committee.

17.     Plaintiff excelled in this role as well. Plaintiff brought in approximately $15,000,000 in annual revenue and $5,000,000 in annual earnings before interest, taxes, depreciation, and amortization ("EBITDA") in his first year as Western Region Leader in 2003.

18.     In recognition of Plaintiff's success and leadership abilities, Gallagher again promoted Plaintiff in 2017 to Regional President.

19.     In all, Plaintiff was responsible for the Western Region for seventeen years from 2003 until his termination in January 2020. During that time, he grew the region from four offices to twenty-three offices with more than 500 employees. Plaintiff also oversaw a bottom-line compound annual growth rate of over 20%.

20.     Plaintiff was also instrumental in Gallagher's completion of over twenty acquisitions in the Western Region that added to Gallagher's geographic and substantive scope. Plaintiff's leadership ultimately led to Gallagher's expansion into numerous new markets, including Seattle, San Diego, Phoenix, Sacramento, Fresno, Spokane, and Boise. Plaintiff accomplished this while growing the existing Los Angeles and San Francisco offices and

maintaining high regional performance figures as compared to the company's other regions.

21.     Plaintiff instituted a number of innovative measures, many of which were adopted nationwide. These included the implementation of regional Sales Leader, Human Resources Leader, and Operations Leader roles; the creation of annual Regional Sales Meetings; and the formation of a Regional Executive Committee.

22.     Plaintiff's leadership and management abilities consistently helped make the Western Region one of the highest performing within GBS. For instance, in 2018, the region reported annual revenue of $165,000,000 and EBITDA of $50,700,000. This represented year-over-year growth of $20,500,000 and $5,900,000, respectively, and exceeded budget goals by $9,400,000 and $1,400,000, respectively. The region reported an overall profit margin of 31% for 2018, which was the highest among all GBS regions.

23.     In 2019, the last full year in which Plaintiff led the Western Region, the region reported annual revenue of $181,000,000 and EBITDA of $54,000,000—again demonstrating substantial year-over-year growth. The region's profit margin again exceeded 30% and was the second highest among GBS regions.

24.     Plaintiff consistently received excellent performance reviews from when he was promoted to Western Region Leader in 2003 through 2016.

25.     Based on Plaintiff's outstanding performance and the outstanding performance of his region, Gallagher repeatedly and consistently granted him awards under the Plan. Plaintiff received awards averaging $150,000 per year every year from at least 2009 through 2019.

26.     Awards under the Plan are granted based on the subjective discretion of Gallagher's senior management. Criteria include an employee's individual performance as well as the performance of any division for which the employee had responsibility. Awards required approval of Gallagher's Chairman and Chief Executive Officer.

27.     The strict criteria and high-level approval required for Plan awards results in 1% or less of all Gallagher employees receiving awards in a given year.

28.     In recognition of Plaintiff's successes, he also consistently received performance awards under two separate bonus programs: the Arthur J. Gallagher & Co. Long-Term Incentive Plan ("LTIP") and the Management Incentive Plan. He received awards under each of these programs annually from at least 2009 through 2019.

29.     LTIP awards are also based on performance criteria and are awarded to just 2-3% of all Gallagher employees in a given year.

30.     At the time of his termination, Plaintiff had approximately $5,837,000 in his Participant Account under the Plan. Per the terms of the Plan, this amount would have vested when Plaintiff attained the age of sixty-two and represented an enormous cost to Gallagher.

31.     Little did Plaintiff know, the "golden handcuffs" provided by Gallagher in the form of the Plan—designed to keep him with the company during his entire career until his retirement age, which it did—would lead to his termination.

**B.      Arthur J. Gallagher Deferred Equity Participation Plan**

32.     Gallagher provides various employee benefits and bonus opportunities to its employees. Among these, certain "key employees" may be eligible for awards under the Arthur J. Gallagher Deferred Equity Participation Plan.

33.     Pursuant to ERISA's requirements, the Plan is governed by a written instrument commonly referred to as the "Plan Document."

34.     The purpose of the Plan is "to encourage key employees of [Gallagher and its affiliates] to remain employed with the Company until at least age 62." The Plan recognizes that "[t]he retention of key employees promotes the interests of the Company and its stockholders by providing continuity of management and leadership and by capitalizing on the investments the Company has made in its key employees over the years."

35.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2) and a non-qualified plan under the terms of 26 U.S.C. § 401. It also a "top-hat plan," which is a plan that "is unfunded and is maintained by an employer primarily for the purpose of

providing deferred compensation for a select group of management or highly compensated employees[.]" 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

36.     The Compensation Committee of the Board of Directors (the "Committee") of Gallagher is the "Plan Administrator" within the meaning of 29 U.S.C. § 1002(16)(A), with authority to delegate its power and authority to Gallagher's Board of Directors or its CEO.

37.     Gallagher contributes the "Annual Funding" of awards under the Plan to a grantor trust, the Arthur J. Gallagher & Co. Deferred Equity Trust.

38.     The Plan also maintains an "Account" for each Participant in the Plan, which is an unfunded bookkeeping account that tracks a Participant's hypothetical "Investments" with funds credited to his or her account.

39.     The Committee determines the annual awards to be made to certain officers of the company, including Gallagher's CEO, as defined by Section 16 of the Securities Exchange Act of 1934. The CEO determines "the list of other Participants and the allocation of the Annual Funding to be credited to each such Participant's Account." Awards are typically granted based on an employee's performance in the prior fiscal year, which includes satisfaction of any individual or divisional performance goals. Awards are made upon the discretion of Gallagher's senior management, including final approval by Gallagher's CEO and Chairman of the Board of Directors.

40.     The Plan provides two separate vesting periods depending on whether the award is an "Initial Allocation" to a given Participant or not. Subject to certain exceptions not relevant here, "a Participant's first allocation under the Plan shall not vest and shall be forfeited unless the Participant provides continuous services to the Company through the date that is 12 months from the 30th day" after the award allocation.

41.     For all other allocations of awards under the Plan, again subject to certain inapplicable exceptions, the "Vesting Date" occurs at different times based on the age of the award recipient:

(A) For allocations made to a Participant's Account at any time on or prior to the date upon which the Participant attains age 61, the date upon which the Participant attains age 62; (B) For allocations made to a Participant's Account at any time after the date upon which the Participant attains age 61, the later of (i) the one-year anniversary of the date that the allocation is credited to the Participant's Account, or (ii) March 31st of the year following the year in which the Award was granted[.]

42. Regardless of which "Vesting Date" applies, the Plan provides as a condition of vesting that the "Participant remains employed by the Company from the date the Participant received the allocation to his or her Account until the date on which such Account becomes vested."

43. The Plan allows Participants to select among various options for the timing and form of distributions of funds in their Participant Accounts. The default distribution options are that a lump-sum payment will be made on the six-month anniversary of the Participant's separation from service with Gallagher.

44. With respect to the forfeiture of awards, the Plan provides: "In the event a Participant's employment with the Company terminates prior to such Participant's Vesting Date, then the Participant's Account under the Plan shall be forfeited." It is this contractual ability to cut Plaintiff off from the millions of dollars he had vested in the Plan that Gallagher would try to use to avoid paying him.

## C. Defendant's Interference with Plaintiff's Attainment of Rights Under the Plan

45. In 2017, Gallagher began targeting Plaintiff based on the future vesting of benefits under the Plan. Plaintiff was one of Gallagher's most senior and long-serving executives. Accordingly, he had among the highest amount of unvested benefits under the Plan at the time of his termination.

46. Ziebell verbally agreed to raise Plaintiff's salary given that Plaintiff had not received a raise in over five years. Ziebell never gave Plaintiff the promised raise.

47. On January 17, 2020, Ziebell, on behalf of Gallagher, sent Plaintiff a termination letter. As the reason for termination, Ziebell claimed that Plaintiff exhibited a "lack of consistent

engagement with [his] team as well as inadequate and incomplete communications to [his] team, broader divisional leadership and [Ziebell]." This proffered rationale is clearly a pretext for interference with Plaintiff's attainment of vested benefits under the Plan as it contradicts decades of outstanding performance.

48. Ziebell and another Gallagher employee hand delivered the January 17, 2020 termination letter. They had provided Plaintiff neither a prior warning nor any communication regarding job performance with Plaintiff.

49. Gallagher typically places an employee with performance issues on a Performance Improvement Plan ("PIP") and gives the employee an opportunity to rectify any performance deficiencies. Ziebell and Gallagher circumvented this standard procedure by terminating Plaintiff without warning.

50. In fact, Plaintiff had never had a negative performance review at the company, other than in 2017. At that time, Ziebell wrote Plaintiff a negative review in 2017 despite the strong performance of the Western Region that year and in prior years.

51. Plaintiff was terminated after receiving awards under the Plan and LTIP in 2019. Receiving bonus awards made to only the highest performing Gallagher employees indicates that Plaintiff was exceeding all of Gallagher's minimum performance requirements.

52. Gallagher offered Plaintiff a severance payment to be paid pursuant to a separation agreement. The payment included amounts representing stock options, bonuses, and other outstanding payments due to Plaintiff but did not include amounts for his unvested Plan awards.

53. Gallagher's termination of Plaintiff is consistent with its past practice of targeting executives near retirement age to prevent their Plan awards from vesting.

54. Upon information and belief, Plaintiff's regional President position was filled by two individuals, neither of whom have the amount of unvested Plan benefits Plaintiff had at the time of his termination. One of these individuals was also farther from reaching age sixty-two—

and vesting any potential Plan benefits—than Plaintiff.

55.     Plaintiff's stellar career and performance were repaid with an unceremonious termination that violates both ERISA and the hollow "values" enshrined in "The Gallagher Way."

**COUNT I**
**Interference with Attainment of ERISA Rights**
**ERISA §§ 510, 502(a)(3)**
**29 U.S.C. § 1140, 29 U.S.C. § 1132(a)(3)**

56.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

57.     ERISA § 510, 29 U.S.C. § 1140, provides, relevant part that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

58.     Defendant qualifies as "person[s]" under this provision.

59.     ERISA, 29 U.S.C. §1132(a)(3), provides a cause of action to remedy any violation of ERISA § 510, 29 U.S.C. § 1140. It authorizes a civil action to be brought:

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

60.     Plaintiff is a former participant under the Plan with a colorable claim to benefits and thus has statutory standing to pursue this claim.

61.     As set forth above, Defendant terminated Plaintiff for the purpose of interfering with his attainment of rights under the Plan. Permitting Plaintiff's substantial amount of unvested benefits to vest would have represented a significant cost to Gallagher—one that could be circumvented by developing a pretextual reason for his termination.

62.     Plaintiff's employment was terminated despite his long history of excellent performance, which continued through 2019 as evidenced by the Plan and LTIP awards made to him in that year.

63.     Numerous other Regional Presidents who had lower amounts of unvested Plan

benefits were not terminated.

64.     Numerous other Regional Presidents who were farther in time from age sixty-two—when their Plan benefits would have vested—were not terminated.

65.     Upon information and belief, Plaintiff had the greatest amount of unvested Plan benefits among all Regional Presidents at the time of his termination.

66.     As a direct and proximate result of Defendant's violation, Plaintiff has suffered numerous losses that can be remedied through appropriate equitable relief under 29 U.S.C. §1132(a)(3), including compensation for back pay and benefits lost and reinstatement of employment.

67.     Plaintiff has exhausted his administrative remedies under the Plan. He filed a claim to the Plan on August 7, 2020. Defendant and the Plan acknowledged receipt on August 7, 2020. The claim was denied on December 7, 2020. Plaintiff filed a timely appeal on January 21, 2021, which was denied on February 26, 2021.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Norbert Chung prays for the following relief:

(a)     An order declaring that Defendant interfered with Plaintiff's attainment of rights under ERISA as described above;

(b)     An order awarding Plaintiff all due equitable relief, including but not limited to:

   (i)     back pay due from the time of his termination of employment through date of judgment; and

   (ii)    reinstatement of Plaintiff's employment from the date of judgment or, in the alternative, front pay;

(c)     An injunctive order prohibiting Defendant from further interfering with Plaintiff's attainment of rights under ERISA;

(d)     An order awarding attorneys' fees pursuant to 29 U.S.C. 1132(g);

(e)     An order for equitable restitution, surcharge, and any other appropriate equitable

relief against Defendant.

Respectfully submitted,

**NORBERT CHUNG**,

Dated: March 25, 2021

By: /s/J. Eli Wade-Scott
 One of Plaintiff's Attorneys
Benjamin H. Richman
brichman@edelson.com
Christopher L. Dore
cdore@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff*