**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORBERT CHUNG, <br><br> *Plaintiff,* <br><br> v. <br><br> ARTHUR J. GALLAGHER & CO., a Delaware corporation, the ARTHUR J. GALLAGHER COMPENSATION COMMITTEE, SUSAN PIETRUCHA, an individual, VAN McCLELLAN, an individual, ARTHUR J. GALLAGHER & CO. SEVERANCE PLAN, and DOES 1 through 50, <br><br> *Defendants.* | Case No.: 21-cv-1650 <br><br> Judge Martha M. Pacold |

**SECOND AMENDED COMPLAINT**

Plaintiff Norbert Chung, by and through his attorneys, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief.

**NATURE OF THE ACTION**

1. Norbert Chung is a former long-time and high-ranking employee of Defendant Arthur J. Gallagher & Co. ("Gallagher") and a former participant in the Arthur J. Gallagher & Co. Deferred Equity Participation Plan (the "Plan"). On January 17, 2020, Chung was suddenly and unexpectedly terminated and, as a part of his termination, Gallagher refused to pay Chung any benefits under the Plan and denied Chung severance pay under the Arthur J. Gallagher & Co. Severance Plan (the "Severance Plan").

2. The Plan is a "pension benefit plan" under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). It also purports to be a "top-hat" plan

1

under ERISA. Top-hat plans are exempted from certain of ERISA's funding, vesting, disclosure, and other requirements that govern non-top-hat plans. The Plan, however, has been maintained as a non-top-hat plan because it fails to meet the requirement for top-hat plans that they be "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051, 1081, and 1101. By the Plan's own terms, its primary—and indeed sole—purpose is to retain high-ranking executives.

3.      Because Gallagher has erroneously maintained the Plan as a top-hat plan when it fails to meet the statutory requirements for such a plan, the Plan violates ERISA's funding, vesting, non-forfeitability, and other requirements.  Accordingly, the Plan's vesting requirements and corresponding forfeiture provisions are unenforceable. These provisions were relied upon in depriving Chung of benefits awarded under the Plan.

4.      The Plan states that no employee's benefits under the Plan will vest until until that employee reaches the age of 62 and maintains employment at Gallagher. If an employee is terminated before that point, *all* of the employee's earned benefits under the Plan are forfeited.

5.      Furthermore, the Plan states that an employee's benefits under the plan will vest with a termination subject to severance. The Severance Plan is a "welfare benefit plan" under ERISA with the purpose of providing eligible employees with severance pay in the event of involuntary termination.

6.      For this action, Chung seeks appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Defendants' maintanence and enforcement of the Plan's unlawful terms, including but not limited to surcharge, restitution, reformation, declaratory relief, and injunctive relief. This includes, *inter alia,* the benefits Gallagher unlawfully forfeited from

Chung under the Plan. He also seeks relief based on Defendants' breaches of their fiduciary duties in managing and administering the Plan and the Severance Plan, in additional benefits due to him under the Severance Plan.

7. Chung also seeks equitable relief for the interference with his protected rights under ERISA § 510, 29 U.S.C. § 1140 for Gallagher's unlawful termination of his employment. This relief includes, but is not limited to, the benefits forfeited under the Plan, back pay, and reinstatement.

8. Accordingly, Mr. Chung brings this action against Defendants seeking (1) equitable remedies and other relief for the improper administration and maintenance of the Plan as a top-hat plan under ERISA, including remedies to recover the benefits that Defendants improperly deemed forfeited, (2) damages resulting from for Defendant Gallagher's unlawful interference with Plaintiff's protected rights in violation of ERISA § 510, 29 U.S.C. § 1140, (3) equitable remedies and other relief for breaches of Defendants' fiduciary duties with respect to the Plan and the Severance Plan, (4) benefits due to Plaintiff under the Severance Plan, and (5) costs and attorneys' fees.

**PARTIES**

9. Plaintiff Norbert Chung is a natural person and resident of the State of California. He was hired by Gallagher in 1995 and, based on his outstanding performance, was promoted to President, Western Region in 2003. By way of his elevated position within the company, Plaintiff participated in the Plan. He was a participant in the Plan within the meaning of ERISA § 3, 29 U.S.C. § 1002(7) because he was eligible to receive benefits under the Plan and may have become eligible for additional benefits under the Plan as described below.

10. Defendant Arthur J. Gallagher & Co. is a Delaware corporation with its

3

headquarters in Rolling Meadows, Illinois. It is the sponsor of the Plan. Gallagher provides insurance brokerage, consulting, and third-party property and casualty claims settlement and administration services to businesses and organizations around the world. As of December 31, 2019, Gallagher had approximately 33,300 employees. Gallagher professes to adhere to "The Gallagher Way," which consists of twenty-five "shared values" of the corporation. Among these, Gallagher claims to "adhere to the highest standards of moral and ethical behavior." Gallagher also alleges that it abides by the tenet that: "We support one another. We believe in one another. We acknowledge and respect the ability of one another."

11. Defendant Arthur J. Gallagher & Co. Compensation Committee (the "Committee") is listed as a named administrator in the Plan. Section 402(a)(1) of ERISA requires that every plan provide for one or more named fiduciaries who will have "authority and control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). ERISA also treats as fiduciaries any other person who exercises any discretionary authority or discretionary control respecting management of a plan, discretionary responsibility in the administration of a plan, or any authority or control respecting management or disposition of plan assets. ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Plaintiff names each such person, as well as any person or group acting as the Plan Administrator, and any person to whom or entity to which the Plan Administrator delegated any fiduciary authority and control (*e.g.*, the Gallagher Board of Directors and/or Chief Executive Officer, as contemplated by the Plan's express language), as additional Defendants (the "Plan Fiduciary Defendants").

12. Upon information and belief, Gallagher is a Plan Fiduciary Defendant because it has exercised authority or control respecting management or disposition of the plans' assets or has exercised discretionary authority or control respecting discretionary responsibility in

4

administrating the plans.

13. Defendant Arthur J. Gallagher & Co. Severance Plan purports to be a welfare benefit plan under ERISA and names ███████████████████████████ ███████████████████████████████ as defined by ERISA.

14. Defendant Susan Pietrucha was Gallagher's Vice President and Chief Human Resources Officer at the time of Plaintiff's termination. As such, she was ████████ ███████████████████████ per the Severance Plan's terms and as defined by ERISA. 29 U.S.C. § 1102(a)(1).

15. Defendant Van McClellan was Gallagher's Vice President for Human Resources at the time of Plaintiff's termination. Upon information and belief, Mr. McClellan exercised authority or control respecting management or disposition of the Severance Plan's assets or exercised discretionary authority or control respecting discretionary responsibility in administrating the Severance Plan and Plaintiff's benefits decision under the Severance Plan.

16. The remaining defendants, DOES 1 through 50, are also Plan Fiduciary Defendants. Plaintiff is currently unaware of the names and capacities of DOES 1 through 50 and will amend this complaint when that information becomes known to him. On information and belief, at all relevant times, DOES 1 through 50 were employees, agents, or representatives of Gallagher engaged in the acts alleged in this complaint, and were acting with authorization and in the scope, course, and furtherance of such relationship.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it arises under ERISA, 29 U.S.C. §§ 1001-1461.

18. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and

28 U.S.C. § 1391(b) because it is the district in which the Plan was administered and where at least one Defendant may be found.

<strong>FACTUAL ALLEGATIONS</strong>

**A.     Plaintiff's Employment with Gallagher**

19.     Plaintiff began working for Gallagher in 1995 in its Los Angeles Branch after being recruited by Jim McFarlane. Plaintiff initially worked as a Vice President, managing Gallagher's Los Angeles Employee Benefits Team. At the time of his termination in 2020, the division in which Plaintiff worked was known as Gallagher Benefit Services ("GBS").

20.     Plaintiff's responsibilities in that role included developing new business, managing existing client relationships, and recruiting and hiring new team members. Ultimately, Plaintiff was responsible for the overall performance of the team.

21.     Plaintiff's annual starting salary was $80,000. He also earned 25% commission on new business generated.

22.     Plaintiff generated $1,000,000 in new business in his first year with Gallagher and $1,200,000 in his second year. Plaintiff's new business continued to grow year after year. He also grew the team to encompass the Orange County benefits practice.

23.     In 2003, based on his successful management and expansion of the Southern California employee benefits team, Gallagher promoted Plaintiff to Executive Vice President and Western Region Leader. Plaintiff's promotion also consisted of being publicly named Corporate Vice Present, an officer of the corporation.

24.     In this role, Plaintiff's responsibilities grew substantially. He was responsible for the business operation of the Western Region—which encompassed eleven states—and all branches within it. This included maximizing operating performance and achieving its financial

6

goals by focusing on mergers and acquisitions, managing strategic planning, driving new revenue, building team-based working environments, and generating operational efficiencies. Plaintiff was also a member of both Gallagher's Executive Committee and Divisional Strategic Planning Committee.

25.   Plaintiff excelled in this role as well. Plaintiff brought in approximately $15,000,000 in annual revenue and $5,000,000 in annual earnings before interest, taxes, depreciation, and amortization ("EBITDA") in his first year as Western Region Leader in 2003.

26.   In recognition of Plaintiff's success and leadership abilities, Gallagher again promoted Plaintiff in 2017 to Regional President.

27.   In all, Plaintiff was responsible for the Western Region for seventeen years from 2003 until his termination in January 2020. During that time, he grew the region from four offices to twenty-three offices with more than 500 employees, and revenues from approximately $5,000,000 to over $180,000,000. Plaintiff also oversaw a bottom-line compound annual growth rate of over 20%.

28.   Plaintiff was also instrumental in Gallagher's completion of over twenty acquisitions in the Western Region that added to Gallagher's geographic and substantive scope. Plaintiff's leadership ultimately led to Gallagher's expansion into numerous new markets, including Seattle, San Diego, Phoenix, Sacramento, Fresno, Spokane, and Boise. Plaintiff accomplished this while growing the existing Los Angeles and San Francisco offices and maintaining high regional performance figures as compared to the company's other regions.

29.   Plaintiff instituted a number of innovative measures at Gallagher, many of which were adopted nationwide. These included the implementation of regional Sales Leader, Human Resources Leader, and Operations Leader roles; the creation of annual Regional Sales Meetings;

and the formation of a Regional Executive Committee.

30. Plaintiff's leadership and management abilities consistently helped make the Western Region one of the highest performing within GBS. For instance, in 2018, the region reported annual revenue of $165,000,000 and EBITDA of $50,700,000. This represented year-over-year growth of $20,500,000 and $5,900,000, respectively, and exceeded budget goals by $9,400,000 and $1,400,000, respectively. The region reported an overall profit margin of 31% for 2018, which was the highest among all GBS regions.

31. In 2019, the last full year in which Plaintiff led the Western Region, the region reported annual revenue of $181,000,000 and EBITDA of $54,000,000—again demonstrating substantial year-over-year growth. The region's profit margin again exceeded 30% and was the second highest among GBS regions.

32. Plaintiff consistently received excellent performance reviews from when he was promoted to Western Region Leader in 2003 through 2016.

33. Many of Plaintiff's performance reviews contained specific appraisals lauding his leadership and communication skills, along with his maintance of professional (both internal and external to Gallagher) relationships.

34. Indeed, Plaintiff's commitment to communication with his team and Gallagher more generally was well-documented. Those records show, for example, that he regularly participated in all regularly scheduled weekly and bi-weekly divisional conference calls and Executive Committee meetings with his peer leaders. Plaintiff was actively involved in subproject committees and initiatives and also had his own regionally scheduled team calls with all direct reports and individuals as well as with the Regional Executive Committee he formed and led. Further, Plaintiff's Regional Executive Committee format served as a platform to

8

develop future leaders, exposing them to greater direct interaction, communication, and engagement with divisional senior executives.

35. Additionally, *all* of Plaintiff's performance reviews specifically contained appraisals related to leadership, communication, and relationships both within and without the company.

36. Based on Plaintiff's outstanding performance and the outstanding performance of his region, Gallagher repeatedly and consistently granted him awards under the Plan. Plaintiff received awards averaging $150,000 per year every year from at least 2009 through 2019.

37. Awards under the Plan are granted based on the subjective discretion of Gallagher's senior management. Criteria include an employee's individual performance as well as the performance of any division for which the employee had responsibility. Awards required approval of Gallagher's Chairman and Chief Executive Officer.

38. The strict criteria and high-level approval required for Plan awards results in 1% or less of all Gallagher employees receiving awards in a given year.

39. In recognition of Plaintiff's successes, he also consistently received performance awards under two separate the bonus programs: the Arthur J. Gallagher & Co. Long-Term Incentive Plan ("LTIP") and the Management Incentive Plan. He received awards under each of these programs annually from at least 2009 through 2019.

40. LTIP awards are also based on performance criteria and are awarded to just 2-3% of all Gallagher employees in a given year.

41. At the time of his termination, Plaintiff had approximately $5,862,000 in his Participant Account under the Plan, in addition to LTIP stock options for a total value in excess of $8,000,000.

9

**B.** **The Arthur J. Gallagher Deferred Equity Participation Plan**

42. Gallagher provides various employee benefits and bonus opportunities to its employees. Among these, certain "key employees"—including highly-paid employees and executives—may be eligible for awards under the Arthur J. Gallagher Deferred Equity Participation Plan (i.e., the Plan) and may also participate in the Supplemental Savings and Thrift Plan (the "Supplemental Plan").

43. Pursuant to ERISA's requirements, the Plan is governed by a written instrument commonly referred to as the "Plan Document."

44. The Plan's expressly stated purpose—set out in its very first paragraph—is "to encourage key employees of [Gallagher and its affiliates] to remain employed with the Company until at least age 62." The Plan recognizes that "[t]he retention of key employees promotes the interests of the Company and its stockholders by providing continuity of management and leadership and by capitalizing on the investments the Company has made in its key employees over the years." In public SEC filings, Gallagher consistently describes the Plan's two objectives as "[p]romot[ing] retention of named executive officers and align[ing] the financial interests of named executive officers with those of stockholders."

45. The Supplemental Plan, in contrast, is maintained solely for the purpose allowing Gallagher's named executive offers and other highly compensated employees to defer compensation. The Supplemental Plan allowed such employees to defer up to 90% of their salary and up to 100% of their annual cash incentive payment.

46. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2) and a non-qualified plan under the terms of 26 U.S.C. § 401.

47. The Compensation Committee of the Board of Directors (the "Committee") of

Gallagher is the "Plan Administrator" within the meaning of 29 U.S.C. § 1002(16)(A), with authority to delegate its power and authority to Gallagher's Board of Directors or its CEO.

48. Gallagher contributes the "Annual Funding" of awards under the Plan to a grantor trust, the Arthur J. Gallagher & Co. Deferred Equity Trust.

49. The Plan also maintains an "Account" for each Participant in the Plan, which is an unfunded bookkeeping account that tracks a Participant's hypothetical "Investments" with funds credited to his or her account.

50. The Committee determines the annual awards to be made to certain officers of the company, including Gallagher's CEO, as defined by Section 16 of the Securities Exchange Act of 1934. The CEO determines "the list of other Participants and the allocation of the Annual Funding to be credited to each such Participant's Account." Awards are typically granted based on an employee's performance in the prior fiscal year, which includes satisfaction of any individual or divisional performance goals. Awards are made upon the discretion of Gallagher's senior management, including final approval by Gallagher's CEO and Chairman of the Board of Directors.

51. The Plan identifies two separate vesting periods depending on whether the award is an "Initial Allocation" to a given Participant or not. Subject to certain exceptions not relevant here, the Plan states that "a Participant's first allocation under the Plan shall not vest and shall be forfeited unless the Participant provides continuous services to the Company through the date that is 12 months from the 30th day" after the award allocation.

52. For all other allocations of awards under the Plan, again subject to certain inapplicable exceptions, the Plan states that a Participant's "Vesting Date" occurs at different times based on the age of the award recipient:

11

(A) For allocations made to a Participant's Account at any time on or prior to the date upon which the Participant attains age 61, the date upon which the Participant attains age 62; (B) For allocations made to a Participant's Account at any time after the date upon which the Participant attains age 61, the later of (i) the one-year anniversary of the date that the allocation is credited to the Participant's Account, or (ii) March 31st of the year following the year in which the Award was granted[.]

53.     Regardless of which "Vesting Date" applies, the Plan provides as a condition of vesting that the "Participant remains employed by the Company from the date the Participant received the allocation to his or her Account until the date on which such Account becomes vested."

54.     Furthermore, the Plan provides that "a Participant shall become vested in his or her Account upon . . . the date of a termination of the Participant's employment by the Company in a manner that entitles the Participant to receive a severance benefit pursuant to the Company's Severance Plan, as then in effect[.]"

55.     The Plan states that it allows Participants to select among various options for the timing and form of distributions of funds in their Participant Accounts. The default distribution options are that a lump-sum payment will be made on the six-month anniversary of the Participant's separation from service with Gallagher.

56.     The Plan also identifies multiple ways in which a Participant's benefits may be forfeited. Under those provisions, the Plan explains that *all* benefits are forfeited if "a Participant's employment with the Company terminates prior to such Participant's Vesting Date," irrespective of how long that Participant has been employed by the company, or if Gallagher determines that the Participant is engaged in conduct competitive with Gallagher's business.

**C.     The Plan is not a "top-hat plan."**

*1.     The Plan violates several of ERISA's requirements*

57.     Under ERISA, "top-hat plans" must be maintained by an employer primarily for

the purpose of provding deferred compensation for a select group of management or highly compensated employees. ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1). Such plans are exempt from many of ERISA's substantive requirements, including those relating to vesting, participation, funding, and fiduciary rules.

58. Because Gallagher maintained the Plan primarily for the purpose of employee retention—and, in fact, maintained a separate plan (the Supplemental Plan) for the purpose of allowing its executives and highly-paid employees (i.e., the same individuals who were eligible to participate in the Plan) to defer compensation—the Plan is is not a "top-hat plan" and is, instead, an "employee pension benefit plan" because it was maintained to "provide[] retirement income to employees" or " results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2). More specifically, the Plan is an "individual account pension plan," which is defined as a "pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

59. Further evidencing that the Plan is not a "top-hat plan" is the fact that Participants, including Chung, had no ability to affect or substantially influence the design and operation of the Plan on an individual basis. The Plan was provided to Chung on a take-it-or-leave-it manner.

60. ERISA imposes vesting, non-forfeiture, accrual, and other requirements on pension plans. ERISA §§ 203 & 204, 29 U.S.C. §§ 1053 (vesting and non-forfeiture) & 1054 (accrual). The vesting and non-forfeiture requirements are contained in 29 U.S.C. § 1053,

13

entitled "Minimum vesting standards." Under § 1053(a), entitled "Nonforfeitability requirements," "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection." Paragraph (1) of subsection 1053(a) states that a "plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable." The term "accrued benefit" means, "in the case of a plan which is an individual account plan, the balance of the individual's account." *Id.* at § 1002(23)(B).

61. Paragraph (2)(B) of subection 1053(a) contains the vesting and nonforfeitability requirements for an individual account plan. Pursuant to those rules, every participant in an individual account plan becomes fully vested in employer contributions made on his or her behalf (and those contributions become non-forfeitable) either after completing no more than three years of service if a "cliff" vesting schedule is used, or after completing no more than six years of service if a graduated vesting schedule is used. Subject to certain inapplicable exceptions, all of an employee's years of service with the employer maintaining the plan must be counted for purposes of computing the employee's non-forfeitable benefit under the plan. ERISA § 203(b)(1), 29 U.S.C. § 1053(b)(1).

62. Because it is not a "top-hat plan," the Plan is not exempt from these requirements and violates the vesting and nonforfeitability requirements of 29 U.S.C. § 1053 because it fails to provide that "an employee who has completed at least 3 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions" under § 1053(a)(2)(B)(ii), and fails to provide that "an employee has a nonforfeitable right to a percentage of the employee's accrued benefit derived from employer contributions determined

14

under the . . . table" in § 1053(a)(2)(B)(iii).

63.     In violation of ERISA, the Plan includes the unenforceable forfeiture provisions. Under ERISA's vesting and nonforfeitability requirements, and based on his years of service with Gallagher (i.e., from 2009-2019), Plaintiff's benefits (i.e., the amounts in his Participant Account) were 100% vested and nonforfeitable.

64.     To remedy this violation, Plaintiff is entitled to other appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to the amount of benefits Gallagher unlawfully withheld from Plaintiff under the Plan's forfeiture provisions.

### 2.     *Defendants breached their fiduciary duties.*

65.     Every ERISA plan must have at least one "named fiduciary" with authority to control and manage the operation and administration of the plan. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Absent a specifically named administrator, the plan's sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

66.     ERISA also makes any person a fiduciary who is vested with or actually exercises discretionary authority or discretionary control respecting management of the plan or the disposition of its assets, or has discretionary authority or responsibility in the administration of the plan. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

67.     Each of the Plan Fiduciary Defendants is vested with discretionary authority respecting management and administration of the Plan and/or disposition of the Plan's assets or has actually exercised discretionary authority respecting management and administration of the Plan and/or the disposition of the Plan's assets within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Accordingly, each of the Plan Fiduciary Defendants is a "fiduciary" with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the

law interpreting that section.

68.     Plan fiduciaries are required to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the skill, care, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

69.     ERISA requires plan fiduciaries to discharge their duties with respect to the plan in accordance with the documents and instruments governing the plan insofar as such document and instruments are consistent with Title I and Title IV of ERISA. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). In other words, if a plan's terms are inconsistent with ERISA, a plan fiduciary has a duty to override the plan document, to the extent necessary to comply with ERISA, in order to faithfully discharge his, her, or its duties.

70.     Under ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), plan fiduciaries must take appropriate steps to ensure that the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

71.     Here, the Plan Fidiciuary Defendants applied the forfeiture provisions—based upon Chung's termination in January 2020—to deny Chung the approximately $5,837,000 in his Plan Account at the time of his termination. Chung earned these forfeited benefits over his many years of employement as a high-ranking executive at Gallagher, including from 2009-2019.

72.     The Plan Fidiciuary Defendants also breached their fiduciary duties by failing to comply with ERISA's funding requirements, including the provisions under 29 U.S.C. §§ 1082,

16

1102, and 1103. Under 29 U.S.C. § 1082(a)(1), "A plan . . . shall satisfy the minimum funding standing applicable to the plan for any plan year." Under 29 U.S.C. § 1102(b)(1), "Every employee benefit plan shall . . . provide a procedure for establishing and carrying out a funding policy and method." And under 29 U.S.C. § 1103(a), "all assets of an employee benefit plan shall be held in trust by one or more trustees." But the Plan Fiduciary Defendants failed to create, fund, and maintain trust funds for any Participant's benefit.

**D.      Regardless of whether it was a "top-hat plan," Gallagher's use of the Plan as cost-savings tool for the company (and related decision to fire Chung) interfered with Chung's protected rights under ERISA.**

73.      For years before Plaintiff's termination, Gallagher had engaged in expense reduction strategies and tactics that, *inter alia*, leveraged the Plan's generous forfeiture provisions against senior executives in the company.

74.      As part of this strategy, Gallagher specifically instructed managers to target long-term employees for company expense reduction terminations, in order to maximize compensation and benefit plan expense recovery. Instructions to implement this practice were provided by GBS CFO to regional leaders and branch managers, who were asked to coordinate with divisional human resource leaders.

75.      This strategy was designed to avoid mass layoffs at the company. By targeting older employees, Gallagher maximized the impact of individual layoffs, as its more long-term employees generally were more highly compensated and—as was the case with Plaintiff—more likely to have accumulated larger retirement benefits, including under the Plan.

76.      Indeed, senior executives at Gallagher were motivated by this expense reduction strategy, given that expense reductions—including expenses saved by former employees' forfeiture of Plan benefits—would be recognized through yearly EBITDA results. As such,

17

terminating individuals like Plaintiff would save year-over-year expenses and, per the terms of the Plan, would also eliminate the need to pay substantial retirement benefits. All of those cost savings would greatly benefit the company and the individuals involved in identitfying those employees that were eventually terminated.

77.     Plaintiff was a specific target of this strategy. In 2017 Gallagher began targeting Plaintiff based on his future vesting of benefits under the Plan. At that time, Plaintiff was one of Gallagher's most senior and long-serving executives. Accordingly, he had among the highest amount of unvested benefits under the Plan's terms at the time of his termination.

78.     Having already served 25 years at the company, Plaintiff fully planned on staying employed at Gallagher to—and beyond—the age of 62. Plaintiff was heavily recruited by outside companies throughout his entire career at Gallagher, but never entertained discussions to seek opportunities elsewhere. Stated otherwise, Plaintiff did not and would not have sought employment elsewhere to fulfill any professional goals; his professional plan was to stay and retire at Gallagher.

79.     Plaintiff's plans were wholly realistic. Not only did the Plan's forfeiture provisions provide Plaintiff with strong incentive to stay employed at Gallagher past the age of 62 (i.e., so that his benefits would vest according to the Plan's terms and not be completely lost), but some of Gallagher's most senior executives were, and to this day are, well-past the age of 62.

80.     But despite these plans, Plaintiff was targeted as a source for company cost savings.

81.     There were many of examples of this targeting. For example, William Ziebell (Plaintiff's manager) verbally agreed to raise Plaintiff's salary given that Plaintiff had not received a raise in over five years. Mr. Ziebell, however, never gave Plaintiff the promised raise.

82.     But the most glaring example is that on January 17, 2020, Mr. Ziebell, on behalf of Gallagher, sent Plaintiff a termination letter. As the reason for termination, Mr. Ziebell claimed that Plaintiff exhibited a "lack of consistent engagement with [his] team as well as inadequate and incomplete communications to [his] team, broader divisional leadership and [Mr. Ziebell]." This proffered rationale was pretext for interference with Plaintiff's attainment of vested benefits under the Plan and contradicts decades of Plaintiff's outstanding performance.

83.     Mr. Ziebell and another Gallagher employee hand delivered the January 17, 2020 termination letter. They had provided Plaintiff neither a prior warning nor any communication regarding job performance with Plaintiff.

84.     As a matter of company practice, Gallagher typically places an employee with performance issues on a Performance Improvement Plan ("PIP") and gives the employee an opportunity to rectify any performance deficiencies. The PIP is not just for lower level employees. Mr. Ziebell and Gallagher circumvented this standard procedure by terminating Plaintiff without warning.

85.     In fact, Plaintiff had never had a negative performance review at the company, other than in 2017. But that review had no bearing on Plaintiff's actual performance. At that time, Mr. Ziebell (during his first year as Plaintiff's manager) wrote Plaintiff a negative review in 2017 despite the strong performance of the Western Region that year and in prior years. Plaintiff contested the points made by Mr. Ziebell in the 2017 performance review, given his performance record at Gallagher discussed above.

86.     Given the 2017 review (and the apparent fact that he was being targeted by Mr. Ziebell), in 2018 Plaintiff took care to substantially document all performance criteria related to his annual performance reviews. As a result, he received a positive performance review in 2018.

87.  Plaintiff did not receive a performance review in 2019.

88.  Plaintiff was terminated after receiving awards under the Plan and LTIP in 2019. Receiving bonus awards made to only the highest performing Gallagher employees indicates that Plaintiff was exceeding all of Gallagher's minimum performance requirements.

89.  Gallagher offered Plaintiff a severance payment to be paid pursuant to a separation agreement. The payment included amounts representing stock options, bonuses, and other outstanding payments due to Plaintiff but did not include amounts for his unvested Plan awards.

90.  Gallagher's termination of Plaintiff is consistent with its past practice of targeting executives near retirement age to prevent their Plan awards from vesting, which, as noted above, was part of the company's overall cost-reduction strategy.

91.  Upon information and belief, Plaintiff's regional President position was filled by two subordinate individuals, neither of whom have the amount of unvested Plan benefits Plaintiff had at the time of his termination. One of these individuals was also farther from reaching age sixty-two—and vesting any future Plan benefits (on information and belief, none had been awarded as of the time of Plaintiff's termination), according the Plan's written terms—than Plaintiff. The amount of benefits that Gallagher would owe to these individuals was much smaller than the amount it would have owed to Plaintiff, but for its decision to terminate.

92.  Had Plaintiff remained employed at Gallagher past retirement age (as he intended to do), he would have conservatively earned around $30 million in additional beneifts, including under the Plan and otherwise. By prematurely terminating him, Gallagher and its senior executives recouped these benefits for itself and themselves.

20

93. Plaintiff's stellar career and performance were repaid with an unceremonious termination that violates both ERISA and the hollow "values" enshrined in "The Gallagher Way."

**E. Defendants improperly denied Plaintiff severance payments under the Severance Plan in furtherance of their effort to deny him benefits under the Plan.**

94. The Severance Plan defines an "Eligible Employee," subject to certain exceptions not applicable here, as

95. In relevant part, the Severance Plan also states that

96. Furthermore, according to the Summary Plan Description,

, meaning that the Severance Plan's administrator and other plan fiduciaries may make benefits decisions under the Severance Plan even if the beneficiary did not submit a formal claim. This is what happened here.

97. Plaintiff qualified as an Eligible Employee throughout his employment with Gallagher and was not terminated for

Accordingly, Plaintiff was eligible for severance benefits upon termination.

98. In fact, Defendants established that Plaintiff was eligible for severance and originally planned on giving him severance payments until they realized that doing so would result in the vesting of his benefits accrued under the Plan. To prevent his Plan benefits from

vesting, Van McClellan and Susan Pietrucha (on information and belief, at the direction of others at Gallagher) denied Plaintiff severance.

99. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

100. Indeed, Karen Carlson, a Gallagher Senior Manager for Stock Plan Administration, created multiple ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

101. Defendants' intent to give Plaintiff severance—and his eligibility for severance—was again demonstrated on October 6, 2019, when ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

102. The fact that Defendants were discussing Plaintiff's termination while working under the assumption that he would receive severance for almost two years before he was actually terminated demonstrates that Plaintiff was not terminated for conduct that required

██████████████████████████████████

103. Furthermore, during this time period, Defendants explicitly discussed the impact of severance on Plaintiff's Plan benefits and, to avoid vesting, decided to deny him severance, offering Plaintiff a Mutual Separation Agreement ("MSA") instead. In an email discussing

Plaintiff's termination from ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

104.     ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ upon information and

belief, the information therein was aggregated at his request to assist in his decision to deny

Plaintiff severance benefits.

105.     With this context, McClellan and, upon information and belief, Bill Ziebell and

Susan Pietrucha worked through multiple iterations of MSAs to conceal the fact that (1) Plaintiff

was eligible for severance, (2) that Plaintiff's Plan benefits would vest upon receiving severance,

and (3) that they had decided to deny him benefits under the Severance Plan to prevent his Plan

benefits from vesting.

106.     For example, early drafts of Plaintiff's MSA contemplated by Van McClellan

explicitly stated: ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

23

107.    The draft MSAs also ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████

108.    The MSA Van McClellan ultimately approved and that Bill Ziebell presented Plaintiff with, however, omitted the key language regarding severance and continued eligibility for Gallagher's benefit plans.

109.    Specifically, the "Characterization of Separation" section stated that "AJGCO will deem Employee's employment to have terminated involuntarily but not as a result of any circumstances that would be considered 'for cause[.]'" █████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████

110.    Neither Van McClellan nor Susan Pietrucha informed Plaintiff of the Severance Plan's eligibility requirements, told him that he was eligible for severance, or told him that receiving severance would cause his Plan benefits to vest. Furthermore, neither McClellan nor Pietrucha informed Plaintiff of their decision to deny him benefits under the Severance Plan. When Bill Ziebell presented Plaintiff with the MSA in January 2020, Plaintiff was unaware that Gallagher maintained a formal severance plan, that he was eligible for severance, or that Defendants had decided to deny him benefits under the Severance Plan. Indeed, it wasn't until March 2024, when Defendants produced a copy of the Severance Plan, that Plaintiff had any idea he was eligible for severance and that Defendants concealed that fact to interfere with his attainment rights under the Plan.

111.    These omissions and the ultimate decision to deny Plaintiff severance were made

with the intent to deprive Plaintiff of his purportedly unvested benefits under the Plan. Thus, Plaintiff was not denied severance due to any rational reason under the Severance Plan, but because Defendants wanted to prevent his approximately $5,862,000 in Plan benefits from vesting.

**F.       Plaintiff sought all required administrative remedies.**

112.    Before filing this lawsuit, Plaintiff sought administrative relief through Section 19 of the Plan Document. His claim was denied.

113.    Plaintiff appealed the decision. His appeal was also denied in a letter explaining that, *inter alia*, Plaintiff was not entitled to any benefits under the Plan whatsoever on account of his termination and the Plan's forfeiture provisions.

114.    Accordingly—as confirmed by Defendants—the Plan as written does not afford Plaintiff any remedy. Accordingly, he has exhausted his remedies under the Plan.

**COUNT I**
**Equitable Relief for Violations of ERISA**
**Declaratory Judgment Act and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**

115.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

116.    There is a dispute between the parties regarding their rights, obligations, and duties under the terms of the Plan. This dispute is ripe for judicial determination.

117.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) authorizes a participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or terms of the plan."

118.    Chung is authorized to bring suit because he is a former participant in the Plan and seeks to redress the unlawful maintenance of the Plan as a top-hat plan while he was an

25

active participant and additionally seeks to enjoin Defendants' ongoing refusal to pay Plaintiff all Plan benefits due under ERISA.

119. Under ERISA, a "top-hat" plan is an unfunded plan that is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1). A top-hat plan must be written to conform to and in fact operate within those requirements.

120. A plan that fails to qualify as a "top-hat" plan must satisfy one of the mandatory minimum vesting schedules set forth in ERISA § 203(a)(1) and (2), 29 U.S.C. § 1053(a)(1) and (2).

121. A plan that fails to qualify as a "top-hat" plan is required, under ERISA § 402(b)(1), 29 U.S.C. § 1102(b)(1), to establish and maintain a funding policy and method consistent with the objectives of the plan and the requirements of Title I of ERISA.

122. Under ERISA § 403(a), 29 U.S.C. § 1103(a), a plan that fails to qualify as a "top-hat" plan is required to hold the plan's assets in trust.

123. While the Plan's language parrots the statutory language pertaining to "top-hat" plans, the very first sentences of the very first section of the Plan—entitled "Purpose"—explains that

> The purpose of this Deferred Equity Participation Plan (the "Plan") is to encourage key employees of Arthur J. Gallagher & Co. (together with its subsidiaries and affiliates, the "Company"), to remain employed with the Company until at least age 62. The retention of key employees promotes the interests of the Company and its stockholders by providing continuity of management and leadership and by capitalizing on the investments the Company has made in its key employees over the years.

124. This purpose is repeated elsewhere by Gallagher, including in its public SEC filings, where it describes the "objective" of the Plan is to "Promote retention of named

26

executive officers and align the financial interests of named executive officers with those of stockholders."

125. Gallagher also offers its most highly compensated employees, including the company's named executive officers—i.e., the same individuals that are eligible for the Plan— the ability to participate in the Supplemental Plan. The Supplemental Plan's primary and only purpose is providing deferred compensation for these individuals, including "up to 90% of their salary and up to 100% of their annual cash incentive payment."

126. Accordingly, based on the Plan's express terms and the existence of the Supplemental Plan, which is available to the same employees that are eligible for the Plan and exists for the primary and sole purpose of compensation deferral, the primary purpose of the Plan is employee retention. The Plan therefore does not qualify for "top-hat" status and, as a result:

- Chung's benefits under the Plan were subject to ERISA's mandatory minimum vesting requirements;

- The Plan must be funded according to a policy and method that satisfies the requirements of ERISA;

- The Plan's assets, including those to be used for the payment of benefits owed to Chung, are subject to ERISA's trust requirement.

127. Chung brings this claim seeking a declaration that his benefits under the Plan are fully vested and non-forfeitable, based on his years of service, pursuant to ERISA's mandatory minimum vesting schedule and requirements for crediting all of Chung's years of service with Gallgaher. In particular, Chung seeks a declaration that:

- The Plan is an "employee benefit plan" under 29 U.S.C. § 1002(3), a "pension benefit plan" under 29 U.S.C. § 1002(a)(A), and an "individual account pension plan" under 29 U.S.C. 1002(34);

- The Plan is not a "top-hat plan" under 29 U.S.C. §§ 1051(2), 1081(a)(3), or 1101(a)(1);

- The Plan is subject to ERISA's reporting, vesting, non-forfeiture, accrual,

27

fiunding, and other requirements under 29 U.S.C. §§ 1021, 1023, 1053, 1054, 1082, 1102, and 1103; and

- The Plan's forfeiture clause is invalid and unforceable under ERISA, including under 29 U.S.C. §§ 1053 and 1054;

128.    Plaintiff is further entitled to a permanent injunction under 29 U.S.C. § 1109(a) and 29 U.S.C. § 1332(a)(3) directing Defendants to:

- Bring the Plan into compliance with ERISA, including the reporting, vesting, non-forfeiture, accura, funding, and other requirements under 29 U.S.C. §§ 1021, 1023, 1053, 1054, 1082, 1102, and 1103;

- Refrain from enforcing the Plan's forfeiture clause in the future;

- Remedy the additional violations stated below;

- Make all contributions to the Plan as necessary to remedy the Plan's funding shortfalls.

129.    Under 29 U.S.C. § 1132(a)(3), Plaintiff is further entitled to other appropriate equitable relief, including an accounting, surcharge, restitution, disgorgement, equitable lien, constructive trust, and any other remedy the Court deems proper. This relief includes, but is not limited to the benefits Gallagher unlawfully deemed forfeited under the Plan's unenforceable forfeiture provisions.

**COUNT II**
**Violation of Reporting and Disclosure Provisions**
**ERISA §§ 101-104, 502(a)(1)(A), (a)(3), 29 U.S.C. §§ 1021-1024, 1132(a)(1)(A), (a)(3)**

130.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

131.    Section 502(a)(1)(A) of ERISA permits a plan participant to bring a suit for penalties when a defendant violates the recordkeeping obligations in ERISA. 29 U.S.C. § 1132(a)(1)(A).

132.    Section 502(a)(3) of ERISA permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms

28

of a plan. *Id.* at § 1132(a)(3).

133.     Under Section 101(d)(1) of ERISA, employers maintaining employee benefit plans are required to issue a notice to beneficiaries and participants whenever the plan fails to make a required installment or other payment required to meet the minimum funding standards under ERISA.  29 U.S.C. § 1021(d)(1).

134.     Defendants failed to furnish Plaintiff with a notice about the Plans under ERISA § 101(d)(1), 29 U.S.C. § 1021(d)(1) informing him that Defendants failed to make payments required to comply with ERISA § 302, 29 U.S.C. § 1082.

135.     Plaintiff is entitled to the statutory penalties for such violations set out in ERISA § 502(c), 29 U.S.C. § 1132(c).

## COUNT III
### Breach of Fiduciary Duty
**ERISA §§ 404(a)(1), 409(a), 502(a)(2), (a)(3) & (g)(1),**
**29 U.S.C. §§ 1104(a)(1), 1109(a), 1132(a)(2), (a)(3) & (g)(1)**
**(Against the Plan Fiduciary Defendants, Susan Pietrucha, and Van McClellan)**

136.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

137.     Under 29 U.S.C. §§ 1109(a) and 1132(a), Plaintiff seeks damages or other equitable relief for (1) the Plan Fiduciary Defendants' breaches of fiduciary duties, and (2) Van McClellan and Susan Pietrucha's breaches of fiduciary duties.

138.     Section 404(a)(1) of ERISA provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries. 29 U.S.C. § 1104(a)(1).

139.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the plan documents. While the basic structure of a plan may be specified (within limits) by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so would violate

29

fiduciary duties. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

140.    First, the Plan Fiduciary Defendants violated their fiduciary duties by failing to fully vest Chung in his plan benefits according to the mandatory minimum vesting schedules described in ERISA § 203(a)(1) and (2), 29 U.S.C. § 1053(a)(1) and (2).

141.    The Plan Fiduciary Defendants breached their fiduciary duties by purporting to forfeit Chung's Plan benefits in violation of the mandatory minimum vesting schedules described in ERISA § 203(a)(1) and (2), 29 U.S.C. § 1053(a)(1) and (2).

142.    The Plan Fiduciary Defendants further violated their fiduciary duties by enforcing the forfeiture provisions in the Plan, as described above. Such enforcement operated to the benefit of Gallagher (resulting in Gallagher retaining millions of dollars that should have been held in trust for Chung)—not Chung or any other Plan participant.

143.    The Plan Fiduciary Defendants breached their ERISA fiduciary duties by failing to provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of Title I of ERISA, as required pursuant to ERISA § 402(b)(1), 29 U.S.C. § 1102(b)(1).

144.    The Plan Fiduciary Defendants breached their ERISA fiduciary duties by failing to ensure that all of the Plan assets were held in trust by one or more trustees pursuant to a written trust instrument as required under ERISA § 403(a), 29 U.S.C. § 1103(a).

145.    On information and belief, beginning in or around 2012, the Plan Fiduciary Defendants knew or suspected that the Plan did not comply with ERISA but did not take any actions to make the Plan compliant or administer the Plan in compliance with ERISA.

146.    Second, Van McClellan and Susan Pietrucha violated their fiduciary duties by (A) concealing material facts from Plaintiff, and (B) failing to act in Plaintiff's best interest in

30

making a benefits decision under the Severance Plan.

147. (A) As plan fiduciaries, McClellan and Pietrucha were required to communicate material facts affecting the interests of beneficiaries—including Plaintiff. The duty to communicate exists when a participant asks fiduciaries for information, and even when he or she does not. Here, McClellan and Pietrucha withheld from Plaintiff three material facts: (1) that Plaintiff was eligible for severance, (2) that if Plaintiff received severance, his accrued benefits under the Plan would vest, and (3) that they had decided to deny Plaintiff benefits under the Severance Plan.

148. McClellan and Pietrucha concealed these facts so that Plaintiff would not appeal the denial of benefits under the Severance Plan and as part of Defendants' effort to interfere with Plaintiff's attainment of benefits under the Plan.

149. (B) ERISA requires a plan fiduciary to discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries*. 29 U.S.C. § 1104(a)(1). McClellan and Pietrucha breached this duty by denying Plaintiff severance with the intent of preventing his Plan benefits from vesting.

150. Specifically, McClellan and Pietrucha knew Plaintiff was eligible for severance benefits and denied him benefits not for any rational reason, but with the explicit purpose of preventing his Plan benefits from vesting.

151. As a direct and proximate result of McClellan and Pietrucha's breaches, Plaintiff suffered losses in the amount of approximately $5,862,000 in Plan benefits, which would have vested had he received severance.

152. Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be

31

personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made through the use of the plan's assets. 29 U.S.C. § 1109. Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. *Id.*

153.     Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

154.     Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

155.     Plaintiff brings this action under ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3), for relief under ERISA § 409(a), 29 U.S.C. § 1109, to recover losses arising from the Fiduciary Defendants' and Defendants McClellan and Pietrucha's breaches of fiduciary duties, as well as the recovery of his reasonable attorney's fees and costs under 29 U.S.C. § 1132(g)(1).

**COUNT IV**
**Interference with Attainment of ERISA Rights**
**ERISA §§ 510, 502(a)(3)**
**29 U.S.C. § 1140, 29 U.S.C. § 1132(a)(3)**
**(Against Gallagher)**

156.     Plaintiff incorporates the foregoing allegations as if fully set forth herein,

157.     Regardless of the nature of the Plan, Gallgaher unlawfully terminated Plaintiff for the purpose of interfering with his rights under ERISA.

158.     ERISA § 510, 29 U.S.C. § 1140, provides, relevant part that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose

32

of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

159.    Gallgaher qualifies as a "person" under this provision.

160.    ERISA, 29 U.S.C. §1132(a)(3), provides a cause of action to remedy any violation of ERISA § 510, 29 U.S.C. § 1140. It authorizes a civil action to be brought:

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

161.    Plaintiff is a former participant under the Plan with a colorable claim to benefits and thus has statutory standing to pursue this claim.

162.    As set forth above, Gallagher terminated Plaintiff for the purpose of interfering with his attainment of rights under the Plan. Permitting Plaintiff's substantial amount of unvested benefits to vest would have represented a significant cost to Gallagher—one that could be circumvented by developing a pretextual reason for his termination.

163.    In addition to the other evidence set forth above, Plaintiff's employment was terminated despite his long history of excellent performance, which continued through 2019 as evidenced by, *inter alia*, the Plan and LTIP awards made to him in that year.

164.    Numerous other Regional Presidents who had lower amounts of unvested Plan benefits were not terminated.

165.    Numerous other Regional Presidents who were farther in time from age sixty-two—when their Plan benefits would have vested according the Plan's terms—were not terminated.

166.    Upon information and belief, Plaintiff had the greatest amount of unvested Plan benefits among all Regional Presidents at the time of his termination.

167.    As a direct and proximate result of Gallgaher's violation, Plaintiff has suffered

33

numerous losses that can be remedied through appropriate equitable relief under 29 U.S.C. §1132(a)(3), including compensation for back pay and benefits lost and reinstatement of employment.

**COUNT V**
**Wrongful Denial of Benefits**
**ERISA § 502(a)(1)(B)**
**29 U.S.C. § 1132(a)(1)(B)**
**(Against the Severance Plan)**

168.    Plaintiff incorporates the foregoing allegations as if fully set forth herein,

169.    Under 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

170.    At the time of his termination, Plaintiff was entitled to severance pay under the Severance Plan because he was an "Eligible Employee" and was not discharged for any reason that would render him ineligible.

171.    At some point between October 2019 and January 2020, Defendant Pietrucha, in her capacity as Plan Administrator, and Defendant McClellan, acting in a fiduciary capacity with respect to the Severance Plan, denied Plaintiff severance pay in an effort to prevent his benefits under the Plan from vesting. This decision was arbitrary and capricious as it was not based on any reasonable interpretation of the Severance Plan's terms.

172.    A denial of benefits need not be in response to a formal application for benefits as long as there was a clear and unequivocal repudiation of rights that is made known to the beneficiary. Furthermore, the Severance Plan's Summary Plan Description does not require an employee to submit a formal claim for benefits. Here, though Plaintiff did not submit a formal claim for severance benefits at the time of his termination, Defendants Pietrucha and McClellan

34

denied Plaintiff severance, which is demonstrated by the fact that they contemplated granting Plaintiff severance on multiple occaisions between 2018 and 2020, but they ultimately did not offer him severance as part of his termination package. This denial of benefits under the Severance Plan was made known to Plaintiff through discovery in March 2024.

173. As a result, Plaintiff was denied at least $475,000 in severance benefits due to him.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Norbert Chung prays for the following relief:

(a) An order declaring that the Plan is an "employee benefit pension plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and that the Plan is not a "top-hat" plan, within the meaning of ERISA § 201(2), 29 U.S.C. § 1051(2); ERISA § 301(a)(3), 29 U.S.C. § 1081(a)(3); and ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1), and is therefore subject to all ERISA requirements.

(b) An order declaring that Defendant interfered with Plaintiff's attainment of rights under ERISA as described above;

(c) An order declaring that that Fiduciary Defendants breached their ERISA-mandated fiduciary duties to the Plan participants and beneficiaries;

(d) An order declaring that that Susan Pietrucha and Van McClellan breached their ERISA-mandated fiduciary duties to Plaintiff;

(e) An order awarding Plaintiff all losses resulting from Defendants' breach of their ERISA-mandated fiduciary dutes to the Plan participants and beneficiaries and the Severance Plan participants and beneficiaries;

35

(f)     An order declaring that Plaintiff was wrongfully denied benefits under the Severance Plan;

(g)     An order awarding Plaintiff all benefits due to him under the Severance Plan;

(h)     An injunctive order prohibiting Defendant from further interfering with Plaintiff's attainment of rights under ERISA;

(i)     An order awarding Plaintiff all due equitable relief, including but not limited to:

     (i)     payment of benefits unlawfully forfeited under the Plan;

     (ii)    back pay due from the time of his termination of employment through date of judgment;

     (iii)   payment of benefits unlawfully withheld under the Severance Plan

     (iv)    reinstatement of Plaintiff's employment from the date of judgment or, in the alternative, front pay; and

     (v)     pre- and post-judgment interest;

(j)     An order otherwise awarding Plaintiff all compensatory damages and/or statutory penalties owed to him;

(k)     An order awarding Plaitniff pre-judgment and post-judgment interest to the full extent permitted by law;

(l)     An order awarding attorneys' fees pursuant to 29 U.S.C. 1132(g); and

(m)     An order for an accounting, equitable restitution, surcharge, disgorgement, equitable lien, constructive trust, and any other appropriate equitable relief against Defendant.

Respectfully submitted,

**NORBERT CHUNG**,

Dated: November 5, 2024

By: /s/J. Eli Wade-Scott
One of Plaintiff's Attorneys

Benjamin H. Richman

36

brichman@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff*